IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN JONES, a Minor, by and through his Parents and Natural Guardians, ASHLEY PARKS and SHAWN JONES | : : : : |
| V | : NO. 2:15-cv-03882-WY |
| THE LANKENAU HOSPITAL and MAIN LINE HEALTH and JOAN KEEGAN, D.O. and ARLENE SMALLS, M.D. and ADEEB KHALIFEH, M.D. | : : : : : : |

## PRETRIAL MEMORANDUM OF DEFENDANTS, MAIN LINE HOSPITALS, INC. D/B/A THE LANKENAU HOSPITAL, JOAN KEEGAN, D.O., ARLENE SMALLS, M.D., AND ADEEB KHALIFEH, M.D.

### A.    DETAILED FACTUAL SUMMARY OF PARTIES CONTENTIONS

Ashley Parks' prenatal care was managed by Dr. Smalls and Dr. Keegan at the Lankenau Ob/Gyn Clinic. There were no concerns that developed to indicate that Ms. Parks was at risk for shoulder dystocia.

On November 30, 2010 at approximately 3:00 a.m., Ms. Parks presented to Lankenau Hospital having gone into spontaneous labor. Dr. Keegan saw Mrs. Jones at 10:45 a.m. and Dr. Smalls saw her at 10:55 a.m. Again, there was nothing to indicate that the Plaintiff was at increased risk for shoulder dystocia. Thereafter, labor progressed and by 3:37 p.m. on November 30, Mrs. Jones was fully dilated, the baby was at zero station, and Ms. Parks began to push. Dr. Khalifeh was present with the patient along with Drs. Keegan and Smalls. Dr. Khalifeh was initially handling the delivery. At 3:49 p.m., the infant's head was delivered from the left occipital anterior position. Gentle traction was applied by Dr. Khalifeh as guidance in a downward manner. However, the anterior shoulder was difficult to deliver, and shoulder

dystocia was diagnosed. When the baby's head first emerged, Dr. Smalls saw the "turtle sign" and suspected that the baby's anterior shoulder was stuck. Ms. Parks was instructed to stop pushing and a call for assistance went out. With the diagnosis of shoulder dystocia, Dr. Keegan took over. The McRoberts maneuver was employed as well as suprapubic pressure. These maneuvers were unsuccessful to deliver the posterior shoulder. This led to a medial-lateral episiotomy. Dr. Smalls left her position assisting with suprapubic pressure and took over from Dr. Keegan. Dr. Smalls put her hand into the vagina and placed the baby's arm across his chest in an effort to reduce the shoulder span and release the baby. As this, too, was unsuccessful, Dr. Smalls pushed the baby back slightly to disimpact the baby, rotated the baby, and thereupon released the shoulder. Delivery of the baby followed immediately. From the time of the identification of shoulder dystocia until full delivery was two up to three minutes.

At delivery, the baby had no respiratory effort or movement and the umbilical cord was wrapped tightly around his neck. The pediatrician assumed care of the newborn while Drs. Small and Keegan cared for Ms. Parks. Cord gases were only slightly below normal indicating there had been no anoxia. Apgar scores were 1 at 1 minute, 7 at 5 minutes and 8 at 10 minutes. The baby weighed 8.6 pounds. After resuscitation, the baby was sent to the well baby nursery, not the neonatal intensive care unit. The presence of Erb's palsy was confirmed by the pediatrician.

Following delivery of the baby, Dr. Smalls spoke with the parents. Dr. Smalls explained to the parents that delivery was complicated by shoulder dystocia and maneuvers had to be performed in order to deliver the baby. The pediatrician noted decreased range of motion of the right arm, which may be transient in nature, but in all likelihood, the baby would require ongoing evaluation. On two occasions after Ms. Jones' discharge, Dr. Smalls called the family at their

home to see how the baby was doing and offer support and left a message from the Hospital, but Ms. Jones never returned her calls.

Plaintiff's Minor attends a regular public school and is performing well; both academically and socially. According to his school records, he does not need and is not receiving any specialized curriculum and/or therapies.

Defendants agree that Plaintiff's Minor sustained a brachial plexus injury at some point during gestation that has resulted in the right upper extremity limitations described below. Plaintiff's Minor has not experienced any brain/cognitive injuries and Plaintiff has no expert opinion to support any such claim.

### B. WITNESSES

#### 1. Fact Witnesses

A. Ashley Parks (Plaintiff-mother)
30 West Redbrook Place
Smyrna, DE 19977

B. Shawn Jones (Plaintiff-father)
30 West Redbrook Place
Smyrna, DE 19977

C. Arleen Smalls, M.D.
c/o Lankenau Medical Center
100 Lancaster Avenue
Wynnewood, PA 19096
(Dr. Smalls will testify as to the patient's prenatal care as well as the labor and delivery of minor-Plaintiff)

D. Joan Keegan, D.O.
c/o Lankenau Medical Center
100 Lancaster Avenue
Wynnewood, PA 19096
(Dr. Keegan will testify as to the patient's prenatal care as well as the labor and delivery of minor-Plaintiff)

    E.    Adeeb Khalifeh, M.D.
c/o Lankenau Medical Center
100 Lancaster Avenue
Wynnewood, PA 19096
(Dr. Khalifeh will testify as to the labor and delivery of minor-Plaintiff)

**2. Liability Witnesses**

    A.    Jay Goldberg, M.D. (board certified obstetrician/gynecologist)
(Dr. Goldberg will provide testimony as to liability and causation)

    B.    Mark Mintz, M.D. (board certified child neurologist with subspecialty board in neurodevelopmental disabilities, epilepsy, and pediatrics)
(Dr. Mintz will testify as to liability, causation, and damages)

    C.    Gregory Alberts, M.D. (licensed psychologist)
(Dr. Alberts will testify as to liability, causation, and damages)

**3. Damages Witnesses**

    A.    Susan Davis, R.N., CRRN, CNLCP (Registered Nurse with a certification in Life Care Planning)
2860 NE 14th St. Cwy; 306D
Pompano Beach, FL 33062
(Nurse Davis will testify as to the life care plan for minor-Plaintiff for services and equipment required for minor-Plaintiff to reside in a safe, independent living environment)

    B.    Jasen M. Walker, Ed.D, CRC, CCM (licensed professional counselor, licensed rehabilitation counselor, certified rehabilitation counselor, and certified case manager)
CEC Associates, Inc.
1220 Valley Forge Road, Unit 9
PO Box 987
Valley Forge, PA 19482
(Dr. Walker will testify as to the educational, vocational, and wage potentials of minor-Plaintiff)

    C.    James A. Stavros, CPA, CFF (licensed certified public accountant and certified in financial forensics)
Forensic Resolutions, Inc.
17 Mechanic Street
Haddonfield, NJ 08033

(Mr. Stavros will testify as to his estimate of minor-Plaintiff's earnings loss and future life care costs)

### C.  **IDENTITY OF EXPERT WITNESSES**

1.  Jay Goldberg, M.D.

Dr. Goldberg will testify that once shoulder dystocia occurred, it was immediately recognized. Appropriate maneuvers to relieve the shoulder dystocia were performed by the physicians and nurses to deliver the baby in a timely fashion. The team approach at relieving the shoulder dystocia was within the standard of care for a teaching institution. Failure to have done so would have placed the baby at greater risk for a hypoxic brain injury. Further, Dr. Smalls appropriately supervised the delivery consistent with the standard of care. As to causation, although a shoulder dystocia occurred and the baby was diagnosed with a brachial plexus injury, Dr. Goldberg will offer the opinion that that does not prove causation. It is documented in the medical record and testified to under oath that only gentle traction was applied. Moreover, there are a significant percentage of brachial plexus injuries that are not associated with shoulder dystocia and the maneuvers used to disimpact the baby's shoulder. Dr. Goldberg will also testify as to his published research on the validity of computer-generated models to predict shoulder dystocia and brachial plexus injury.

2.  Mark Mintz, M.D.

Dr. Mintz will testify as to his IME of minor-Plaintiff, Shawn Jones, including his medical history, neurodevelopmental history, examination, testing, findings, and diagnoses. Dr. Mintz will testify that there is no history of orthopedic or neuro surgeries or other medical/surgical interventions. Moreover, there is no documentation of significant pain, central nervous system neurodevelopmental disabilities or cognitive impairment. His examination revealed

clinical findings of residual right paniplexopathy involving the neuromuscular territories of all levels of the brachial plexus, with preservation of neuromuscular function of the right hand/wrist, and selected preservation of some functions of the remainder of the right upper extremity. There were no clinical/ examination findings of central nervous system impairment or deficits.

In addition, Dr. Mintz will testify about research and medical literature supporting the fact that congenital brachial plexus palsy can often occur prior to delivery of the fetal head and/or prior to the identification of shoulder dystocia from the natural forces of labor and delivery or during intrauterine/prenatal life as well as from other pathogenic mechanisms including, but not limited to genetic predisposition, infection/inflammation, hypoxia-ischemia, uterine abnormalities, and intrauterine maladaptation. Moreover, Dr. Mintz will testify consistent with the medical literature that brachial plexus injury is not solely dependent upon the magnitude of the forces of labor and delivery and/or the forces imparted by a delivering health care provider, but rather it is a complex situation involving, but not limited to, the biological predisposition of the nerves to withstand different levels of force, the vector and rate of forces of labor and delivery, the types of forces applied by the operator and/or natural forces of labor and delivery (rotational, compressive, traction, stretch), aspects and circumstances of labor, "risk factors," anatomic considerations of the mother and fetus, and the co-efficient of friction between the delivery health care provider and the fetus.

Moreover, Dr. Mintz will also opine that there are a number of physical and/or skilled labor jobs Shawn Jones can do despite his right upper extremity restrictions. Shawn presents as a child of normal intelligence with excellent social skills and abilities, and there are no barriers to achieving a college level education. Consequently, there are an array of professions open to him. He will further opine that as Shawn ages and receives occupational therapy, he should be able to

care for himself in all activities of daily living. Therefore, he disagrees that Plaintiff's Minor will need a personal care attendant for the rest of his life. It is also highly unlikely that he will require the number and frequency of neurology evaluations as predicted by Plaintiffs' experts.

    3.    Gregory Alberts, M.D.

Dr. Alberts will testify as to his neuropsychological evaluation of Shawn Jones for the purposes of assessing his cognitive/neuropsychological status; review of the medical and educational records of minor-Plaintiff; his neuropsychological evaluation, interview, testing, examination results, clinical impressions and analysis and opinions. Dr. Alberts will testify that: his neuropsychological evaluation of minor-Plaintiff does not demonstrate cognitive impairment manifest on IQ testing; current measure of early academic skills revealed average to high average levels of performance relative to other children at his grade level; there is no evidence of record that Shawn demonstrated any significant hyperactivity, depression, amplified somatic complaints, or other marked impairments; Shawn's educational potential and employability is substantially higher than what Plaintiffs' experts predict; the wage loss forecasts of Plaintiffs' experts are not valid; Shawn will not require a personal care attendant for the rest of his life; the school reports of Shawn's cognitive, academic, social, and other developmental skills revealed consistently average findings on multiple assessments; and Shawn was discontinued from occupational, physical, and speech therapy in 2014.

    4.    Susan Davis, R.N., CRRN, CNLCP

Susan Davis will testify as to her review of the life care plan submitted by Plaintiffs' expert, Dr. Desai, all available records, review of statistics, as well as her life care plan review including services and equipment required for Shawn Jones to reside in a safe, independent living environment.

Ms. Davis calculates a lifetime cost projection for medical management, rehabilitation/ vocational/durable medical equipment and assistive devices to total $74,154.50 over Minor-Plaintiff's lifetime.

### 5. Jasen M. Walker, Ed.D, CRC, CCM

Mr. Walker will provide opinions regarding his review of all of the medical and educational records, deposition testimony, review of expert reports with respect to Shawn Jones' vocational potential, future employability, and earning power, educational attainment, vocations available and statistics as to earnings for those occupations. Further, Mr. Walker will testify that there is no evidence that minor-Plaintiff will suffer any loss of earning power as a result of his diagnosis of right brachial plexopathy.

### 6. James A. Stavros, CPA, CFF

Mr. Stavros will provide opinions with respect to the deficiencies in Plaintiff's economic report as well as to any claimed economic losses to minor-Plaintiff and estimated future life care costs.

According to Mr. Stavros, Mr. Staller's report is flawed for failing to assess work life probabilities with half of their earning estimates resulting in an overstatement of loss estimates. Moreover, Mr. Staller and Ms. Pierce have not explained the use of only five pre-injury occupations or why they only selected five post-injury positions. Further, Ms. Pierce did not address whether Shawn could obtain education beyond high school, earning substantially more than average high school earnings. According to Mr. Stavros, it is reasonable to assume that Shawn's earning potential increases as he obtains education beyond high school, and assuming he would still be physically limited, he would have more vocational options in less physically demanding jobs as he obtains more education.

Mr. Stavros calculated Shawn's loss of earnings in two scenarios based on the vocational reports of Ms. Pierce and Mr. Walker. The first is based on Mr. Walker's opinion that Shawn has not sustained any loss of earning capacity. Therefore, there is no basis to calculate any loss of earnings under this scenario. Under the second scenario, Mr. Stavros estimated Shawn's pre-injury earnings based on U.S. Census Bureau statistics using a growth rate of 2.06%. He estimated post-injury earnings to total $20,138 based on Ms. Pierce's report, applied a fringe benefit rate of 5.7% of gross earnings, and reduced his loss estimate for the probability of unemployment of 5.9% of net lost earnings based on statistics. Mr. Stavros' loss estimates assume Shawn would have secured employment at age 18 through his anticipated work life. Mr. Stavros discounted future loss amounts to present value utilizing a rate of 1.63%. Mr. Stavros calculated Shawn's estimated loss of earnings after all appropriate adjustments at $212,751.00.

Mr. Stavros also calculated estimates of Shawn's future life care costs. Based upon Ms. Desai's life care plan report, after applying all financial adjustments, including present value discounting factor of 4.75%, Mr. Stavros calculated future life care costs at $195,320 and $995,117 grown for inflation, but not discounted.

Based upon Ms. Davis' life care plan report, after applying all financial adjustments, including present value discounting factors of 4.75%, Mr. Stavros calculated future life care costs as $37,620 and $132,100 grown for inflation, but not discounted.

### D.     CURRICULUM VITAE FOR DEFENSE EXPERT WITNESS

1. Jay Goldberg, M.D. – A true and correct copy of the curriculum vitae of Dr. Goldberg is attached hereto as Exhibit "A".

2. Mark Mintz, M.D. – A true and correct copy of the curriculum vitae of Dr. Mintz is attached hereto as Exhibit "B".

3. Gregory Alberts, M.D. – A true and correct copy of the curriculum vitae of Dr. Alberts is attached hereto as Exhibit "C".

4. Susan Davis, R.N., CRRN, CNLCP – A true and correct copy of the curriculum vitae of Ms. Davis is attached hereto as Exhibit "D".

5. Jasen M. Walker, Ed.D, CRC, CCM – A true and correct copy of the curriculum vitae of Dr. Walker is attached hereto as Exhibit "E".

6. James A. Stavros, CPA, CFF – A true and correct copy of the curriculum vitae of Mr. Stavros is attached hereto as Exhibit "F."

E. **DESIGNATION OF VIDEOTAPED TRIAL TESTIMONY**

Defense counsel does not intend to videotape any testimony for trial. To date, Plaintiffs' counsel has not indicated that he will need to videotape any trial testimony.

F. **DESIGNATION OF DEPOSITION TESTIMONY TO BE OFFERED AT TRIAL**

Deposition of Ashley Parks

Pg. 29, line 21 to pg. 30, line 9

Pg. 30, line 20 – pg. 31, line 19

Pg. 84, line 2 – pg. 85, line 15

Pg. 85, line 23 – pg. 86, line 14

Pg. 91, line 17 – pg. 92, line 20

Pg. 94, line 2 – pg. 95, line 23

Pg. 96, line 6 – pg. 99, line 9

### G. LIST OF EACH ITEM OF MONETARY DAMAGES CLAIMED

Please see Plaintiffs' Pretrial Memorandum.

### H. STIPULATIONS

The parties have agreed to stipulate as to the authenticity of the medical records. Defense counsel has also proposed the following stipulations: (1) voluntary dismissal of any claim for corporate liability against Main Line Hospitals, Inc. d/b/a The Lankenau Hospital[1]; and (2) the voluntary dismissal of any claim for cognitive impairment of minor-Plaintiff due to the lack of any expert testimony to support such a claim. Plaintiffs' counsel has recently agreed to stipulate to the voluntarily dismissal of Plaintiffs' claim for corporate liability.

### I. OBJECTIONS TO/GROUNDS FOR OBJECTIONS TO THE ADMISSIBILITY OF ANY ITEM OF EVIDENCE EXPECTED TO BE OFFERED BY ANOTHER PARTY

It is anticipated that Plaintiffs' counsel will offer into evidence a shoulder dystocia video. Defendants object to this video on the grounds that it is not relevant as it does not depict what occurred in this case. Moreover, it implies causation for which Plaintiffs have the burden of proof.

---

[1] A motion for summary judgment is currently pending on this issue.

11

## J. STATEMENT OF ANY ANTICIPATED LEGAL ISSUES ON WHICH THE COURT WILL BE REQUIRED TO RULE

It is anticipated that the Court will need to rule on the following legal issues: duplicative expert opinions; introduction of speculative opinions not based on facts in evidence; and Plaintiffs' claim for cognitive impairment of minor-Plaintiff.

Respectfully submitted,

MARSHALL DENNEHEY WARNER
COLEMAN AND GOGGIN

BY: *[signature]*
E. CHANDLER HOSMER, III, ESQUIRE
CAROLYN DiGIOVANNI, ESQUIRE
Attorneys for Defendants
Attorney I.D. No.: 28499 / 50405
620 Freedom Business Center, Suite 300
King of Prussia, Pa 19406
Phone: (610) 354-8250 / Fax:(610) 354-8299
E-Mail: echosmer@mdwcg.com
        cbdigiovanni@mdwcg.com

Date: December 19, 2016

LEGAL/108225460.v1

12

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN JONES, a Minor, by and through his :
Parents and Natural Guardians, ASHLEY PARKS :
and SHAWN JONES :
　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　V　　　　　　　　　　　　　　　　:　　NO.  2:15-cv-03882-WY
　　　　　　　　　　　　　　　　　　　　　　　　　　　:
THE LANKENAU HOSPITAL and :
MAIN LINE HEALTH and :
JOAN KEEGAN, D.O. and :
ARLENE SMALLS, M.D. and :
ADEEB KHALIFEH, M.D. :

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendants' Pretrial Memorandum was electronically filed with the Court on this date and is available for viewing and downloading from the ECF System.

　　　　　　　　　　　　　　　　　　　　　　MARSHALL DENNEHEY WARNER
　　　　　　　　　　　　　　　　　　　　　　COLEMAN AND GOGGIN


BY: _____
　　　　　　　　　　　　　　　　　　　　　　E. CHANDLER HOSMER, III, ESQUIRE
　　　　　　　　　　　　　　　　　　　　　　CAROLYN DiGIOVANNI, ESQUIRE
　　　　　　　　　　　　　　　　　　　　　　Attorneys for Defendants
　　　　　　　　　　　　　　　　　　　　　　Attorney I.D. No.:  28499 / 50405
　　　　　　　　　　　　　　　　　　　　　　620 Freedom Business Center, Suite 300
　　　　　　　　　　　　　　　　　　　　　　King of Prussia, Pa 19406
　　　　　　　　　　　　　　　　　　　　　　Phone: (610) 354-8250 / Fax:(610) 354-8299
　　　　　　　　　　　　　　　　　　　　　　E-Mail:  echosmer@mdwcg.com
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　cbdigiovanni@mdwcg.com

Date: December 19, 2016

LEGAL/108225460.v1